IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Jonas Armstrong, Matthew Becerra, Johnny Burchfield, James Cheeks, Keith Dawson, Lewis Floyd, Nicholas Fountas, Horace Harrington, Murry Hunt, Paul Ibraham, Emir Vinson as petitioning special administrator for the Estate of Nyles Johnson, Joseph King, Ronald Knox, Johnathan Kolb, Paul Lieb, Nicholas Lykins, Andante McGee, Lawrence Pfost, Edward Rivera, Ahamad Saleh, Raed Saleh, Kevin Smith, and Augustus Wilson,<br><br>*Plaintiffs,*<br><br>-vs-<br><br>Sheriff of Cook County and Cook County, Illinois<br><br>*Defendants* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | *(jury demand)*<br><br><br><br>26-cv-_____ |

## COMPLAINT

Plaintiffs, by counsel, allege as follows:

1.     This is a civil action arising under 42 U.S.C. § 1983. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343.

## PARTIES

1.     Plaintiffs are Jonas Armstrong, Matthew Becerra, Johnny Burchfield, James Cheeks, Keith Dawson, Lewis Floyd, Nicholas Fountas, Horace Harrington, Murry Hunt, Paul Ibraham, Emir Vinson as petitioning

special administrator for the Estate of Nyles Johnson, Joseph King, Ronald Knox, Johnathan Kolb, Paul Lieb, Nicholas Lykins, Andante McGee, Lawrence Pfost, Edward Rivera, Ahamad Saleh, Raed Saleh, Kevin Smith, and Augustus Wilson. Each individual plaintiff and Nyles Johnson was a member of the plaintiff class certified in *Rogers v. Sheriff*, No. 15-cv-11632 and was excluded from participation in that case when the class was redefined. Plaintiffs bring this case within one year of the order denying the motion to reconsider their exclusion from the class in *Rogers*.

2.      Defendant Thomas Dart is the Sheriff of Cook County. Plaintiffs sus Dart in his official capacity only.

3.      Defendant Cook County is jointly responsible with defendant Sheriff for providing medical services to detainees at the Cook County Jail and is an indispensable party pursuant to *Carver v. Sheriff of LaSalle County*, 324 F.3d 947 (7th Cir. 2003).

## Methadone Maintenance at the Cook County Jail

4.      Opioid use disorder ("OUD") is a chronic disease with symptoms characterized by uncontrollable cravings for opioids, loss of control, increased tolerance to opioids, and withdrawal symptoms.

5.      OUD is best treated by a stable dose of medication assisted treatment ("MAT"), such as methadone maintenance.

6. Methadone maintenance was first employed in a jail in the United States at New York Riker's Island Jail in 1987.

7. The consensus in the medical community since at least 2007 is that opioid use disorder is a chronic brain disease and patients need to be maintained on their treatment.

8. At all times relevant to this lawsuit, there was in force at the Cook County Jail a written policy entitled Opioid Treatment Program, Policy # G-07.1. a copy of which is attached to and incorporated into this complaint.

9. Policy # G-07.1 applied to persons who entered the Jail while enrolled in an Opioid Treatment Program.

10. The policy required continuation of the Opioid Treatment Program for pregnant women for the duration of their pregnancies.

11. All other persons, as well as women after delivery, were subjected to mandatory detoxification, defined by the written policy to be "a linear taper to zero, with daily doses decreasing at an integer rate proportional to initial dose, starting at the verified prior dosage and decreasing not more than 7 Mg each day." (Policy # G-07.1 at 3, § B(5)(g).

12. Defendant Cook County adopted the mandatory tapering program for non-pregnant persons without any legitimate penological purpose,

-3-

without reliance on data, and in disregard for the scientific evidence about the dangers of interrupting methadone maintenance. The program implements the County's arbitrary policy decision to not provide methadone maintenance treatment to detainees at the Jail.

13.     There is significant suffering associated with the mandatory tapering policy adopted by defendant Cook County. Withdrawal symptoms can last for several weeks; these symptoms include anxiety, irritability, restlessness, chills, muscle pain, weakness, tremor, nausea, and vomiting; psychological symptoms from withdrawal are also be painful and debilitating.

14.     In addition to gratuitous suffering, the mandatory tapering policy is harmful: Persons subjected to the policy have an increased risk of relapse and a higher risk of death.

15.     Patients do not return to their pre-methadone maintenance dosage baseline after withdrawal symptoms diminish, but often continue to experience symptoms of opioid use disorder, such as cravings for opioids, indefinitely.

## NOTICE TO DEFENDANTS

16.     In 2006, the United States Court of Appeals for the Seventh Circuit concluded in *Davis v. Carter*, 452 F.3d 686 (7th Cir. 2006) that a

person in a methadone maintenance program has a medical need to continue to receive methadone

17. Defendants received further notice of the unconstitutionality of their mandatory tapering policy in *Parish v. Sheriff of Cook County*, No. 07-cv-4369 (N.D. Ill. May 30, 2019), a class action that challenged, *inter alia*, the Jail's methadone policy. (*Parish* settled after the district court denied cross-motions for summary judgment.)

18. The record in *Parish* contained evidence that mandatory tapering caused gratuitous physical pain and psychological discomfort and placed patients at high risk for subsequent death or disability associated with drug overdoses and life-threatening infections, including HIV infection.

## APPLICATION OF THE WRITTEN POLICY TO PLAINTIFFS

19. Plaintiff Jonas Armstrong entered the Cook County Jail as a pretrial detainee on June 4, 2019.

20. After defendants verified that plaintiff Armstrong was enrolled in a methadone maintenance program, they provided Armstrong with methadone at a tapering dosage from 65 mg to 2 mg, starting on June 5, 2019 and continuing until he left the Jail on July 2, 2019, as shown in the graph below:



21.     Plaintiff Matthew Becerra entered the Cook County Jail as a pretrial detainee on June 16, 2018.

22.     After defendants verified that plaintiff Becerra was enrolled in a methadone maintenance program, they provided Becerra with methadone at a tapering dosage from 140 mg to 1 mg, starting on June 18, 2018 and continuing until he left the Jail on August 3, 2018, as shown in the graph below:



23.     Plaintiff Johnny Burchfield entered the Cook County Jail as a pretrial detainee on December 14, 2017.

24.     After defendants verified that plaintiff Burchfield was enrolled in a methadone maintenance program, they provided Burchfield with methadone at a tapering dosage from 135 mg to 80 mg, starting on December 15, 2017 and continuing until he left the Jail on December 28, 2017, as shown in the graph below:



25.     Plaintiff James Cheeks entered the Cook County Jail as a pretrial detainee on September 15, 2018.

26.     After defendants verified that plaintiff Cheeks was enrolled in a methadone maintenance program, they provided Cheeks with methadone at a tapering dosage from 70 mg to 2 mg, starting on September 16, 2018 and continuing until October 16, 2018, as shown in the graph below:



27.    Plaintiff Keith Dawson entered the Cook County Jail as a pre-trial detainee on July 3, 2019.

28.    After defendants verified that plaintiff Dawson was enrolled in a methadone maintenance program, they provided Dawson with methadone at a tapering dosage from 40 mg to 2 mg, starting on July 5, 2019 and continuing until he left the Jail on July 24, 2019, as shown in the graph below:



29.     Plaintiff Lewis Floyd entered the Cook County Jail as a pretrial detainee on February 4, 2018.

30.     After defendants verified that plaintiff Floyd was enrolled in a methadone maintenance program, they provided Floyd with methadone at a tapering dosage from 60 mg to 2 mg, starting on February 5, 2018 and continuing until he left the Jail on March 4, 2018, as shown in the graph below:



31.     Plaintiff Nicholas Fountas entered the Cook County Jail as a pretrial detainee on February 22, 2019.

32.     After defendants verified that plaintiff Fountas was enrolled in a methadone maintenance program, they provided Fountas with methadone at a tapering dosage from 90 mg to 1 mg, starting on February 23, 2019 and continuing until he left the Jail on March 28, 2019, as shown in the graph below:



33. Plaintiff Horace Harrington entered the Cook County Jail as a pretrial detainee on August 16, 2018.

34. After defendants verified that plaintiff Harrington was enrolled in a methadone maintenance program, they provided Harrington with methadone at a tapering dosage from 65 mg to 9 mg, starting on August 18, 2018 and continuing until he left the Jail on September 12, 2018, as shown in the graph below:



35.     Plaintiff Murry Hunt entered the Cook County Jail as a pretrial detainee on May 11, 2019.

36.     After defendants verified that plaintiff Hunt was enrolled in a methadone maintenance program, they provided Hunt with methadone at a tapering dosage from 35 mg to 21 mg, starting on May 13, 2019 and continuing until he left the Jail on May 20, 2019, as shown in the graph below:



37.     Plaintiff Paul Ibraham entered the Cook County Jail as a pretrial detainee on August 18, 2017.

38.     After defendants verified that plaintiff Ibraham was enrolled in a methadone maintenance program, they provided Ibraham with methadone at a tapering dosage from 200 mg to 2 mg, starting on August 19, 2017 and continuing until he left the Jail on October 10, 2017, as shown in the graph below:



39.     Plaintiff Nyles Johnson entered the Cook County Jail as a pre-trial detainee on August 7, 2017.

40.     After defendants verified that plaintiff Johnson was enrolled in a methadone maintenance program, they provided Johnson with methadone at a tapering dosage from 55 mg to 1 mg, starting on August 8, 2017 and continuing until he left the Jail on August 29, 2017, as shown in the graph below:



-12-

41.   Plaintiff Joseph King entered the Cook County Jail as a pretrial detainee on February 15, 2018.

42.   After defendants verified that plaintiff King was enrolled in a methadone maintenance program, they provided King with methadone at a tapering dosage from 60 mg to 2 mg, starting on April 17, 2018 and continuing until he left the Jail on May 12, 2018, as shown in the graph below:



43.   Plaintiff Ronald Knox entered the Cook County Jail as a pretrial detainee on July 23, 2019.

44.   After defendants verified that plaintiff Knox was enrolled in a methadone maintenance program, they provided Knox with methadone at a tapering dosage from 30 mg to 2 mg, starting on July 25, 2019 and continuing until he left the Jail on August 8, 2019, as shown in the graph below:



45.     Plaintiff Johnathan Kolb entered the Cook County Jail as a pre-trial detainee on August 27, 2017.

46.     After defendants verified that plaintiff Kolb was enrolled in a methadone maintenance program, they provided Kolb with methadone at a tapering dosage from 200 mg to 118 mg, starting on August 28, 2017 and continuing until he left the Jail on September 10, 2017, as shown in the graph below:



47.     Plaintiff Johnathan Kolb again entered the Cook County Jail as a pretrial detainee on September 5, 2018.

48.     After defendants verified that plaintiff Kolb was enrolled in a methadone maintenance program, they provided Kolb with methadone at a tapering dosage from 125 mg to 76 mg, starting on September 5, 2018 and continuing until he left the Jail on September 18, 2018, as shown in the graph below:



49.     Plaintiff Paul Lieb entered the Cook County Jail as a pretrial detainee on October 2, 2018.

50.     After defendants verified that plaintiff Lieb was enrolled in a methadone maintenance program, they provided Lieb with methadone at a tapering dosage from 25 mg to 1 mg, starting on October 3, 2018 and continuing until he left the Jail on October 15, 2018, as shown in the graph below:



51.     Plaintiff Nicholas Lykins entered the Cook County Jail as a pretrial detainee on November 23, 2017.

52.     After defendants verified that plaintiff Lykins was enrolled in a methadone maintenance program, they provided Lykins with methadone at a tapering dosage from 40 mg to 34 mg, starting on November 24, 2017 and continuing until he left the Jail on November 27, 2017, as shown in the graph below:



53. Plaintiff Andante McGee entered the Cook County Jail as a pre-trial detainee on May 18, 2019.

54. After defendants verified that plaintiff McGee was enrolled in a methadone maintenance program, they provided McGee with methadone at a tapering dosage from 120 mg to 2 mg, starting on May 20, 2019 and continuing until he left the Jail on June 23, 2019, as shown in the graph below:



55. Plaintiff Lawrence Pfost entered the Cook County Jail as a pre-trial detainee on April 25, 2018.

56. After defendants verified that plaintiff Pfost was enrolled in a methadone maintenance program, they provided Pfost with methadone at a tapering dosage from 100 mg to 3 mg, starting on April 26, 2018 and continuing until he left the Jail on May 26, 2018, as shown in the graph below:



57. Plaintiff Edward Rivera entered the Cook County Jail as a pre-trial detainee on August 8, 2018.

58. After defendants verified that plaintiff Rivera was enrolled in a methadone maintenance program, they provided Rivera with methadone at a tapering dosage from 90 mg to 74 mg, starting on August 9, 2018 and continuing until he left the Jail on August 13, 2018, as shown in the graph below:



59.     Plaintiff Ahamad Saleh entered the Cook County Jail as a pre-trial detainee on August 4, 2017.

60.     After defendants verified that plaintiff Saleh was enrolled in a methadone maintenance program, they provided Saleh with methadone at a tapering dosage from 30 mg to 2 mg, starting on August 5, 2017 and continuing until he left the Jail on August 19, 2017, as shown in the graph below:



61.     Plaintiff Raed Saleh entered the Cook County Jail as a pretrial detainee on March 12, 2018.

62.     After defendants verified that plaintiff Reed Saleh was enrolled in a methadone maintenance program, they provided him with methadone at a tapering dosage from 110 mg to 85 mg, starting on March 13, 2018 and continuing until he left the Jail on March 18, 2018, as shown in the graph below:



63.     Plaintiff Kevin Smith entered the Cook County Jail as a pretrial detainee on July 2, 2019.

64.     After defendants verified that plaintiff Smith was enrolled in a methadone maintenance program, they provided Smith with methadone at a tapering dosage from 70 mg to 58 mg, starting on July 3, 2019 and continuing until he left the Jail on July 7, 2019, as shown in the graph below:



65.    Plaintiff Augustus Wilson entered the Cook County Jail as a pretrial detainee on December 30, 2017.

66.    After defendants verified that plaintiff Wilson was enrolled in a methadone maintenance program, they provided Wilson with methadone at a tapering dosage from 30 mg to 2 mg, starting on December 31, 2017 and continuing until he left the Jail on January 14, 2018, as shown in the graph below:



## DAMAGES

67.    As a result of the foregoing, each plaintiff (or for Emir Vinson, that plaintiff's decedent) was deprived of rights secured by the Fourteenth Amendment to the Constitution of the United States and suffered physical and emotional injuries.

68.    Plaintiffs hereby demand trial by jury.

-22-

WHEREFORE plaintiffs request that the Court award appropriate compensatory damages, and that the costs of this action, including reasonable attorneys' fees and costs, be taxed against defendant Cook County.

/s/ <u>Kenneth N. Flaxman</u>
Kenneth N. Flaxman
ARDC No. 830399
Joel A. Flaxman
Inaara Tajuddin
200 S Michigan Ave, Ste 201
Chicago, IL 60604
(312) 427-3200
*Attorneys for Plaintiffd*

| COOK COUNTY HEALTH & HOSPITALS SYSTEM CCHHS | Category: **Cermak Health Services** | |
|---|---|---|
| Subject: **Special Needs and Services** | Page 1 of 6 | Policy #: G - 07.1 |
| Title: **OPIOID TREATMENT PROGRAM** | Approval Date: 02/09/2016 | Posting Date: 2/25/2016 |

## PURPOSE

The purpose of this policy is to provide access to opioid treatment: (1) for detoxification of inmates who were enrolled in an opioid treatment program (OTP) immediately before arrest; and (2) for maintenance of pregnant women who are opioid dependent.

## POLICY

Cermak Health Services, as an operating unit of the Cook County Health and Hospitals System, will sponsor a certified, accredited, and licensed opioid treatment program (OTP). The purposes of this program are: (1) detoxification of newly admitted inmates who were enrolled in an OTP immediately before arrest; and (2) maintenance of pregnant women who are opioid-dependent for the duration of their pregnancies, with detoxification to follow delivery.

Cermak will comply with federal and state laws and regulations in its opioid treatment program, including 42 CFR 8.11-12 and 77 ILAC 2060. The certifying, accrediting, and licensing bodies will be, respectively: the Center for Substance Abuse Treatment (CSAT) of the Substance Abuse and Mental Health Services Administration (SAMHSA) of the US Department of Health and Human Services (DHHS); the National Commission on Correctional Health Care (NCCHC); and the Division of Alcohol and Substance Abuse (DASA) of the Illinois Department of Human Services (IDHS).

## DEFINITIONS (from 42 CFR 8.2)

*Certification* – the process by which SAMHSA determines that an opioid treatment program is qualified to provide opioid treatment under the federal opioid treatment standards.

*Accreditation* – the process of review and acceptance by an accreditation body that has been approved by SAMHSA to accredit opioid treatment programs using opioid agonist treatment medications.

*Program sponsor* – the person named in the application for certification described in Sec. 8.11(b) as responsible for the operation of the opioid treatment program and who assumes responsibility for all its employees, including any practitioners, agents, or other persons providing medical, rehabilitative, or counseling services at the program or any of its medication units. The program sponsor need not be a licensed physician but shall employ a licensed physician for the position of medical director.

*Program medical director* – a physician, licensed to practice medicine in the jurisdiction in which the opioid treatment program is located, who assumes responsibility for administering all medical services performed by the program, either by performing them directly or by delegating specific responsibility to authorized program physicians and healthcare professionals functioning under the medical director's direct supervision.

*Detoxification* – the dispensing of an opioid agonist treatment medication in decreasing doses to an individual to alleviate adverse physical or psychological effects incident to withdrawal from the sustained use of an opioid drug and as a method of bringing the individual to a drug-free state. Short-term

| Title: | Page | Policy # |
|---|---|---|
| OPIOID TREATMENT PROGRAM | 2 of 6 | G-07.1 |

detoxification treatment means detoxification treatment for a period not in excess of 30 days. [However, taper from very high initial methadone dosage may exceed this time period.]

*Maintenance* – the dispensing of an opioid agonist treatment medication at stable dosage levels for a period in excess of 30 days in the treatment of an individual for opioid addiction.

## PROCEDURE

### A. Program administration

1. *Cermak's Chair of Correctional Health* will designate a program medical director for the OTP.
2. *The program sponsor* will designate a program administrator for the OTP
3. *The program administrator* will:
    a. Ensure compliance with all state and federal regulations (see above);
    b. Ensure accessible and timely services for all program participants;
    c. Prepare monthly statistical reports as required by applicable state and federal regulations and submit to the medical director;
    d. Convene a multidisciplinary OTP Committee with representatives from the appropriate departments.
    e. Facilitate meetings
        i. Schedule meetings at least quarterly;
        ii. Prepare agenda and minutes;
    f. Maintain archive of statistical reports and meeting minutes.
4. *The program medical director* will be an authorized methadone prescriber and will:
    a. Update this policy and any related policies for the program as needed, within the larger framework of the institutional policies of Cermak Health Services;
    b. Provide clinical oversight;
    c. Request waivers from CSAT when required for individual patients;
    d. Lead quality improvement efforts for the program;
    e. Delegate specific responsibilities to authorized program physicians and/or healthcare professionals functioning under his or her direct supervision.

### B. Initial enrollment

At the time of intake to the jail:
1. *The intake screener* will
    a. Ask whether the inmate reports participation in an opioid treatment program and, if so, will provide appropriate forms to complete (see below);
    b. Ask whether the inmate regularly uses heroin or opioid medications obtained on the street;
    c. Refer the patient to an intake clinician if either of the above questions is answered 'yes.'
2. *The inmate*, if wishing to continue ongoing opioid detoxification while incarcerated, will:
    a. Fill out the upper portion of Cermak Form 853.14, "Methadone Referral," including his or her name and aliases, other identifying information, and name of previous program and counselor;
    b. Sign the consent for release of information on the referral form;
    c. Sign acknowledgment on Cermak Form 863.47, "List of Inmate Rights for the Opioid Treatment Program."
3. *The intake clinician* will interview and examine the patient. If a diagnosis of opioid dependence or addiction is made, and the patient affirms participation in an opioid treatment program at the time of incarceration, then proceed as follows:

**Page 2**

| Title: | Page | Policy # |
|---|---|---|
| OPIOID TREATMENT PROGRAM | 3 of 6 | G-07.1 |

   a. Complete the health assessment form (see Cermak Policy E-04);

   b. Determine whether the patient is experiencing opioid withdrawal symptoms (see Cermak Policy G-06) and whether the patient is pregnant;

   c. For pregnant patients:

      i. If dependent on opioids and not previously enrolled in an OTP and experiencing moderate – severe withdrawal symptoms, refer to emergency room at John Stroger Hospital;

      ii. If dependent on opioids, previously enrolled in an OTP, and manifesting withdrawal, refer to emergency room at John Stroger Hospital;

      iii. If dependent on opioids, previously enrolled in an OTP, and not manifesting withdrawal, proceed as below.

   d. For all others: refer to the Primary Provider, who will proceed in accordance policy G-06.

4. A designated Cermak staff member will, address any new OTP paperwork from the Urgent Care and, for each:

   a. Contact the methadone program named by the patient: if unable to make contact on a weekend or holiday, document each attempt and continue daily until contact is made;

   b. Upon contacting the program, ascertain enrollment status;

      – If enrollment is denied by the program, document accordingly on the Methadone Referral Form

      – Or, if enrollment is confirmed, then continue as follows;

   c. The methadone program is to verify the amount and date of the last dose;

   d. Complete the lower portion of Cermak Form 853.14, "Methadone referral;"

   e. Contact the Security Office or the Shift commander of the patient's housing division to arrange escort to the pharmacy; document date, time, phone extension, and name of person contacted on the referral form;

   f. Re-contact the Shift Commander on each shift until the inmate is escorted to the Urgent Care, or until the patient is released from custody, whichever comes first; annotate the referral card for each reminder call;

5. *The clinician on duty in the Urgent Care will*

   a. Interview and examine the patient and verify the diagnosis of opioid dependence or addiction;

   b. Verify that the patient has already consented for treatment (otherwise obtain consent);

   c. Complete a "History and Physical" form, entering a diagnosis of opioid dependence or addiction; in the electronic health record:

   d. Initiate Cermak Form 847.21, "Substance Abuse Treatment Plan," including an explicit diagnosis of opioid dependence;

   e. Sign the prescription to start methadone treatment and specify the initial dose;

   f. For pregnant patients:

      i. Verify that laboratory testing has confirmed the pregnancy

      ii. Prescribe a constant daily dose at the verified prior dosage;

   g. For other patients, prescribe a linear taper to zero, with daily doses decreasing at an integer rate proportional to initial dose, starting at the verified prior dosage and decreasing not more than 7Mg each day.

   h. Obtain countersignature from a physician authorized to prescribe methadone;

   i. For any patient starting with a methadone dose of 100 mg or more:

      i. Perform a baseline EKG and check the QT interval before the first dose;

| Title: | Page | Policy # |
|---|---|---|
| OPIOID TREATMENT PROGRAM | 4 of 6 | G-07.1 |

    ii.   If the QT interval is significantly prolonged, hold methadone and confer with program medical director;

  i.   For any patient starting with a methadone dose of 180 mg or more:

    i.   Hold methadone and confer with program medical director;

    ii.   Give half the initial dose the first day and then taper as prescribed after the second day.

  j.   Order a urine drug screen on the patient;

  k.   Send the patient and the OTP folder to the laboratory to obtain a urine sample for drug screening.

6.   *The laboratory* will:

  a.   Perform a urine drug screen and send the report to the OTP program;

  b.   Send the patient and the OTP folder to the pharmacy for administration of the first dose of methadone.

7.   *The patient* will:

  a.   Provide a urine sample;

  b.   Sign for the initial dose.

8.   *Pharmacy staff* will, upon receiving verification of program participation enter the approved patient into the Substance Abuse and Methadone Management System (SAMMS), which transmits patient information to the State of Illinois Division of Alcoholism and Substance Abuse (DASA) database.

9.   *The pharmacist will then*

  a   Prepare the initial dose of methadone;

  b.   Observe the patient swallow the dose;

  c.   Annotate an appointment card for the inmate to bring each day while on the program.

## C.  Daily dosing.

On each successive day until completion of the program:

1.   *The patient* will present his appointment card to the officer on the living unit.

2.   *A CCDOC officer* will escort the participating *patient* from the living unit to the Pharmacy, typically between 8:00 and 9:00 am except for *patient* s with court dates, who will be brought in the afternoon.

3.   *Pharmacy staff* will, if the *patient* has not arrived by 12:00 pm, contact the shift commander and document the date, time, phone extension, and name of the shift commander on the daily methadone worksheet.

4.   *The patient* will present his appointment card to the pharmacist and sign for the day's dose.

5.   *The pharmacist* will:

  a.   Check whether the *patient* is due to complete a random drug screen, once between Day 8 and Day 14 and then again between Day 15 and Day 21 (and monthly thereafter, for those on long-term or maintenance methadone).; if due, ensure that the urine sample is obtained before the dose is given;

  b.   Prepare the day's dose of methadone;

  c.   If the *patient* has been put into segregation or isolation, prepare the dose and arrange that the dose is given to the patient.

  d.   Observe the patient swallow the dose;

  e.   Annotate the appointment card.

## D.  Clinical follow-up

1.   *The OTP coordinator* will schedule each patient for at least one appointment with a program clinician during opioid taper and another upon completion of the taper.

2.   *A program clinician* will, at the OTP clinic visit:

| Title: | Page | Policy # |
|---|---|---|
| OPIOID TREATMENT PROGRAM | 5 of 6 | G-07.1 |

a. Obtain additional details of history and check physical examination or lab results as indicated;
b. Assess for symptoms and signs of active opioid withdrawal and treat as needed; consider slowing rate of taper if symptoms are severe.
c. Offer HIV and hepatitis screening, as well as hepatitis B immunization;
d. Refer as needed to mental health and/or medical services;
e. Provide additional patient education;
f. If the patient opts to withdraw from the OTP, notify the divisional clinician to follow up.
g. Formulate a plan with the *patient* for follow-up care in the community in the event that the *patient* is released, whether during the taper or after completion.

3. *The program medical director* will advise program clinicians regarding clinical and administrative matters as needed.

**E. Diversion control**

1. *The Pharmacy Director* will:
   a. Stock and use only methadone for the OTP program;
   b. Account for methadone stock in a DEA-approved safe;
   c. Limit access to the methadone safe to authorized pharmacists.
2. *Authorized pharmacists* will:
   a. Have only one stock bottle open at any time; withdraw a new bottle from the safe when needed;
   b. Secure the opened dispensing bottle of methadone in a DEA – approved safe when not in use.
   d. Inventory methadone stock:
      i. End-of-shift – An existing pharmacist and an incoming pharmacist each take and reconcile the inventory. Both enter their inventories on a DASA form, "Daily Methadone Accountability."
      ii. Weekly – take and record a separate inventory electronically.
      iii. In case of spillage or wastage – immediately inventory the methadone to determine amount lost and record on the daily methadone work sheet. A witness must verify and sign. Prepare and submit an incident report to the pharmacy supervisor before the end of the shift.
3. *Pharmacy administration* will review all records for accountability through its quality assurance program.
4. *The Director of Pharmacy* will submit all quality assurance reports and notification of all discrepancies to the OTP program administrator.

**CROSS REFERENCES**

| NCCHC Standards addressed by this policy | G-06 |
|---|---|
| Pertinent ACA Standards | 4-ALDF-4C-36 |
| Cermak policy number in last revision | 01-08G-06; 07-05-02; OTP-111 |
| Revision dates of all previous versions | 2/2006, ..., 10/1987 for 01-08G-06 & 07-05-02; 4/2007 for OTP-111 |
| Date of last review, if later than last revision | n/a |
| Other related Cermak policies | G-06, G-07 |
| Pertinent system-wide CCHHS policies | n/a |
| Pertinent custody directives | n/a |

| Title: | Page | Policy # |
|---|---|---|
| OPIOID TREATMENT PROGRAM | 6 of 6 | G-0⧫.1 |

## POLICY UPDATE SCHEDULE

To be reviewed no later than 1 year after posting date.

**POLICY LEAD**  Chair of Correctional Health

**REVIEWER(S)**  Director of Nursing
Director of Pharmacy
Quality Improvement Committee

**APPROVAL PARTY (IES)**

_____
Chief Operating Officer

_____
Chair of Correctional Health

_____
Director of Pharmacy

_____
Director of Nursing

**REVIEW HISTORY**
Written: August 01, 2010
Revised: Nov. 4, 2014     Approved: 11/04/2015     Posted: 02/27/2015
Revised: Feb. 9, 2016     Approved: 02/09/2016     Posted: 02/25/2016